May it please the Court, Your Honor, I'm Daniel Maynard and I appear on behalf of the petitioner, Richard Bible. I would like to reserve ten minutes for rebuttal. I assume I'll be responsible for monitoring. You will. The total time is what you have and try to sit down with some time left. Thank you, Your Honor. The reason we're here today is that Mr. Bible was convicted of first degree murder, but he did not receive a fair trial by a fair tribunal, by a jury that was unbiased and only relied upon the evidence that was heard in the courtroom. Mr. Bible's case is one of those that's quite unusual. Mr. Bible was, in 1988 when this event occurred, was probably the most notorious case in northern Arizona. It's the case that probably had the most publicity of any case, at least in northern Arizona, if not in Arizona altogether. In this particular case, from the very beginning until the very end, Mr. Bible did not receive due process and did not get a fair trial. The pretrial publicity in this case was so great that this Court should presume that there was prejudice in this case. The two cases that I rely upon to show that the Arizona Supreme Court did not apply, accurately apply federal law, constitutional law, is Ervin v. Dowd and also the Shepard case. In Ervin v. Dowd, the Court determined that a person had to be tried by a fair tribunal. And in that particular case that was set in Indiana, the Court looked at the circumstances of pretrial publicity to determine whether or not there was a fair trial and determined that there was not. And that's the first time we have a case that presumes that there was prejudice. The Arizona Supreme Court, in dealing with this case, basically gave no reference to Dowd at all. I believe it's only mentioned in a footnote. They rely on other cases that the Supreme Court has looked at, including Richelieu, Estes, and they looked at the Shepard case. But they misapplied the rule in Shepard. The Arizona Supreme Court misstated the law when it said that the defendant must show that pretrial publicity was so outrageous that it turned the trial into a mockery of justice or a legal or a mere formality. That's not what the law provides. When one looks at the Shepard case, it is very clear that what is required is an impartial jury free from outside influences. And one looks at the pretrial publicity to determine whether there were outside influences that corrupted the jury. In this case, as the evidence shows ---- Did you cite the Dowd case in your brief? Yes. And where is it? Your Honor, I don't have ---- I apologize. I don't have the ---- I'm sorry. I didn't recognize the case name. I'm a little embarrassed. It's Ervin? Ervin. E-r-i-r-v-i-n. Okay. It's not in your table of authority. So you didn't cite it in your brief, but that's the principal case you're relying on? That is ---- Yes. Okay. Is that a Supreme Court case? Yes. Ervin v. Dowd at 366 U.S. 717. It's a 1961 case. And I also relied on ---- And although you're faulting the Arizona Supreme Court for only noting it in a footnote, you didn't cite it in your brief? I did cite it in my supplemental brief, Your Honor. Okay. All right. Okay. What that case holds is that you have to have an impartial jury. And the court in Dowd basically looks to see what outside influences impact the jury to cause it to be impartial. And in that particular case, they found that there was a great deal of pre-trial publicity, and they found that it was a small community around Evansville, Indiana, is where this particular murder occurred. It's very similar to the facts in this case. The community was Flagstaff, Arizona. In 1988, it was approximately 45,000 people. Coconino County had approximately 100,000 people. It was one newspaper in town. There were broadcasts that started from the day that the Wilson girl came up missing in June 6th of 1988. Those broadcasts continued. They were both on the radio. They were on television. There were over 140 news articles that came out concerning this. The other component ---- And I apologize. I'm not specifically familiar with the facts of Dowd, but I'll become more familiar with it. But most of the cases I'm familiar with involve publicity that either or both focused on the particular defendant. And in this case, you mentioned there was publicity from the moment that the girl turned up missing. That's right. And you could understand there'd be publicity. That's the kind of story that attracts a lot of attention. But nothing in that publicity would have identified your client or anyone as a defendant because nobody had been identified as a defendant at that point. The Shepard case, many of the other cases involve ---- The Estes case involved trial proceedings that get so highly publicized. And, of course, the defendant is clearly identified as part of that. Was there publicity like that, of that nature? I counted up the articles at one point, a lot of articles about the crime, not so many articles about the trial. Yes. Well, there are articles about the trial. There's articles about the trial every day. In fact, the Flagstaff paper created a logo that said Bible on Trial. This was before CNN started creating their logos. It's there. This is the first time it's done. That publicity wouldn't be part of the publicity that you're objecting to because at that point the jury likely would have been seated. Well, the jury's seated, but I am going to object to that publicity because of the impact it had and the fact that the jury was not sequestered. In the jury, there is evidence in the record that jurors actually saw themselves on television. You have evidence of one juror of a report that one juror said that ---- That's right. That's right. And we don't know whether that juror was told about it or whether the juror actually saw it. Don't know. But that's all we know. What I do know is that the juror wasn't supposed to be talking to anybody about the case, and yet somehow or another it comes into the court and says, geez, I understand that I was on TV last night. Now, on the record we have, we don't know whether the juror actually saw it or he talked to somebody or somebody just on the street told him. I hate to disagree with a federal court judge. Happens all the time. Okay. You're wrong on the facts of this case. Bible is arrested the day of the girl comes up missing. Immediately, within the next two or three days, he is listed as the primary suspect in this case. So the pretrial publicity starts immediately. It is not like some other cases where they wait until he's arrested. What happens in this case is that the Wilson girl comes up missing. Bible is perceived by the local authorities to be a primary suspect, and they arrest him that day. The newspapers start immediately saying that he's the primary suspect. In fact, before they ever find the body of the Wilson girl, the sheriff's department releases to the newspapers that Bible has failed a test, a lie detector test dealing with his knowledge or concerning the missing of the Wilson girl. That appears in the newspapers over the course of the next year and a half at least seven times, that he failed a lie detector test. This is the kind of evidence that clearly wasn't going to come in at trial. But starting within days after Jennifer Wilson comes up missing and Bible is identified as the primary suspect, the people in Flagstaff, Arizona are inundated with articles that he is the suspect. The articles talk about his past. They talk about a prior crime that he had been involved in and had served time in prison on. He became the focal point. The Wilson girl's body is not found for 19 days. I would be candid with the court and say that during that 19-day period, I think there are one or two articles that say Bible may be innocent. We don't know. After the body is found, everything is focused on Bible and everything focuses on what evidence they have and their gathering to convict him. As I point out in the papers, this issue concerning the lie detector test is crucial in this case because not only does the sheriff's department leak to the press that he has failed a lie detector test, the prosecution begins almost, well, not immediately, but soon when the motions start, they file a motion to have the lie detector test admitted into evidence. And I would ask the court to look at, I think it's docket 98, which is the petitioner's reply on the merits in the original habeas petition that we filed. There are a number, if not all, of the articles or a lot of the articles concerning Bible. But the lie detector test issue actually becomes headlines on several of the articles. And like I said, I believe it's either seven or eight articles it comes out in. The case law is clear that a jury is supposed to rely upon the evidence they hear within the courtroom to determine whether or not somebody is guilty. In this case, they are inundated pre-trial with statements about him having been a child rapist, which he was not. He had been convicted of kidnapping and rape of his 17-year-old cousin earlier. The papers were reporting stories that said that him being a child rapist in this incident with his cousin was very similar to what happened to the Wilson girl. The similarity was that it happened in the vicinity of the same particular hill, but one's a 9-year-old girl, one's a 17-year-old girl. One is killed, one's not. One's a relative, one he doesn't know. There's a lot of dissimilarities. But the press goes to great lengths to talk about, for instance, that the DNA evidence, which eventually the Arizona Supreme Court did throw out, was going to be conclusive and convict Mr. Bible. There were articles that Mr. Bible had stated to inmates within the jail that he was responsible for this and that they would be testifying. That never happened. That was false. There were articles about him attempting to escape and potentially making a knife to kill a matron. These are- Counsel, Judge Gould has a question for you. Putting it to the side for a moment, whatever evidence was in all these articles, did the jurors affirm to the trial court that they would base their verdict on the evidence presented in court and the law as the judge instructed them? I believe that they did. But the problem, Judge, is during the vordire and the pretrial preparation or picking of the jury. What happens in this case is that they decide to use a jury questionnaire. I feel strange looking at it. Decide to use a jury questionnaire to ask questions. Bible's attorney, and let me just briefly state that under the ineffective assistance claim that I have in this case, you need to remember that when Mr. Bible is first charged with this crime, the attorney that is appointed to him is somebody who has the bar exam. She has recently got out of law school. Coconino County had just started a public defender's office up there. The woman who handles his case for the first, I think it's nine months during the investigation, had not even passed the, was not a member of the Arizona Bar at the time that she is doing all of this work. In fact, it got so bad, she had gone to her boss, she had gone to the judge, they did nothing. She eventually went to her law professor at the University of Arizona, and he said, geez, you have to withdraw from this. Ultimately, she does withdraw. The public defender withdraws also. But what ends up happening is Bible gets a series of lawyers who have not done very much criminal work. The next one he gets is one who has a contract to spend 20 hours a week doing criminal defense work, and he's never done a death penalty case. And he also has about approximately 60 other criminal cases. He basically begs the court to give him somebody else. They finally bring in somebody from Phoenix. When they're picking the jury, in many people's minds, and I think most lawyers who do trial work understand, that is a crucial time period. The lawyer decides to leave during the time period that the prospective jurors are filling out the questionnaire. And the trial judge tells him, you can leave if you want to, but if the jurors have questions, I'm going to answer them. So the lawyer leaves. The colloquy, though, that is the most important, and I point out to the court that it's on February 27th of 1990, it's a reporter's transcript dealing with a juror asked the court this question, said, the juror is concerned about whether or not she can be unbiased. And this is in front of everyone in the panel. And the court says, so this is a different question. This really talks about whether your mind is made up. And she says, I don't know how to answer that truthfully because what I've heard, you know, but if I had to be on the jury, I know I would, could. The court says, you'd be fair. And the juror says, I try to be. Doesn't say she would. I try to be. And the judge says, sure, that's what this is talking about. And the juror then says, so how would you? And the judge says, I would answer that yes, because you can be fair and impartial, even though you've heard something about it. So the judge, we're now stuck with a jury that the judge has just instructed them, outside of the presence of the lawyer for Bible, that says, you can be fair and impartial, and therefore, you should say that. Judge, we don't know whether these jurors were fair and impartial or not. The judge's comments to that juror, which the lawyers weren't there to pick up on, tainted the whole jury process from the very beginning. Every one of the 14 jurors that were picked in this case had read about this case, had heard about this case, and over half of them had talked to others about this case. Two of them said they had an unqualified opinion that Bible was guilty. One of them actually decides the case, and one of them is an alternate. The jury process was skewed from the very beginning. The pretrial publicity kept Bible from getting a fair jury. The lack of getting effective counsel from the very beginning kept him from getting a fair jury. This jury was supposed to be picked and was supposed to decide this case based on what came out in the courtroom, not what they had heard in the pretrial publicity, not what the trial judge told them when the judge tells them you can be fair. That's what he said. That's in the record. That's a denial of due process. The Shepard case is the second case, Your Honor, that we rely upon. And Shepard is a case that, yes, there's a lot of pretrial publicity, and everybody in the legal profession knows that F. Lee Bailey made his career off the Shepard case. But in Shepard, Shepard, there was a lot of publicity. Shepard was a very wealthy man, and he was able to hold his own press conference He was able to meet with the press. He was out for a long period of time before this case ever went to trial. Bible's case, from the very beginning, Bible's the focus. Everything is pointing to Bible. The press is convinced that Bible has committed this crime. There is no impartiality in Flagstaff, Arizona, in 1990, when they're picking the jury to try this case. Judge, the cases, and in particular the Dowd case, stands for the proposition that it really doesn't matter how heinous the crime is or how overwhelming the evidence seems to be or what station in life the defendant happens to have at that time. The thing that is required is that they be tried by an impartial jury that is going to get all of their information from within the courtroom. Now, the trial setting itself in the pretrial setting, and I'll watch this clock closely, tainted this process, as did the prosecutor. The prosecutor, over and over again, puts in pretrial memorandums that are reported in the press concerning the failing of a lie detector test, knowing that it's never going to come into evidence, but he does it over and over again. Whenever he is in the courtroom, many times when he's in the courtroom at least, he is constantly egging on defense counsel. You have to get a sense of the setting in this case. It's a very small courtroom. It's only three or four rows of benches. It's small. The court determined to have it broadcast. The court allowed cameras in the courtroom and then had a live feed out in the hallway. So it would be like there were two cameras out in this hallway so that when I walked in, there was a gauntlet of the victim's family and friends that taunted the lawyers as they came in. It got so bad that one of the lawyers had a cinder block thrown to the window of his house. He carried a loaded gun in his office. He was told not to go through this gauntlet because they were afraid and they feared for the safety of the lawyers. This is like a bad John Grisham novel. The setting is not the kind of setting that we expect for a fair trial, and certainly Richard Bible didn't get a fair trial. I have five minutes left, and I'll reserve that time. May it please the Court. My name is Jeff Sick. I'm an assistant attorney general in the Arizona Attorney General's Office. I represent Appalachian in this matter. The state court below correctly applied clearly established Supreme Court precedent to each claim raised and exhausted by Richard Bible and reasonably applied that clearly established precedent to the facts of those claims. I'm going to take exception to the Irving v. Dowd using that as presumed prejudice. That's an actual prejudice case. There are only three presumed prejudice cases with respect to pretrial publicity. Those are Shepard, Estes, and Rideau. Those cases are clearly different, as the Arizona Supreme Court found, to the facts of this case. In Shepard, and I think counsel was mischaracterizing some of the findings in Shepard, Shepard may have had money and may have somehow had a press conference, but the facts that the Supreme Court found in presuming prejudice and saying that Shepard did not receive a fair trial were the massive overrunning by the media in the courtroom, the fact that Shepard went through a three-day inquisition in a high school gym that was televised where he was questioned without counsel, those types of things where the media in the courtroom had a table next to the jury and wires running all over, there is nothing in the record in this case to show that that type of atmosphere took place in Bible's trial. In fact, the record shows that the court limited one camera to the courtroom. I don't find anything in the record, and I could be wrong, but when I reviewed the record, I didn't review anything saying there was a gauntlet that the attorneys had to walk through in order to get into the court. The trial court kept control of that courtroom with respect to the media and with respect to everything that was going on in the trial. For example, when one of the jurors was told, we think, that he or she was seen in a news clip, the trial judge admonished the cameraman in the courtroom and told them that if that happened again, the cameras were going to be gone. In addition, during the trial, and it was with respect to the 404B evidence, the prior victim who was testifying, the victim's father in this case became upset and yelled out profanity and left the courtroom. The trial judge immediately instructed the jury to disregard anything that they heard, that they are only to decide the case solely on the facts as presented on the witness stand, and took the added measure of making sure that the victim's father was barred from the courtroom for the remainder of the trial. So this was not a mockery of justice. This was not a trial run amok with media. This was a controlled setting in which a jury who indicated that they would be fair and unbiased sat. With respect to the jury selection that took place, defense counsel drafted a 30-page jury questionnaire and agreed that that would be the proper procedure for jury selection in this case. The jurors who filled out the questionnaire did so during a day, and it took approximately an hour and a half or so. Defense counsel, Bible, and the prosecutor all absented themselves from that process. Defense counsel explains later that he didn't want Ricky Bible sitting there while the prospective jurors were filling it out. Would there have been a procedure by which the defense counsel could have been present, but Bible could have been excused? I'm sure there could have been a procedure where both counsel could have stayed. However, just speaking from experience, in those situations, no counsel or a defendant stays while a jury panel of 160 fills out a questionnaire. But there could be a procedure if they had asked for it, but they didn't ask for that. In fact, no counsel and the defendant were present during that procedure. The question that the trial judge made it clear they were free to stay if they wanted to. That's correct. There are too many moving pieces in this. And the judge also made it clear that he would stay in case there were questions, which opens the door to the kind of dialogue that we heard read by Bible's counsel a moment ago. That's correct. The judge indicated to counsel that he would stay in case there were questions with respect to the 30 pages of questionnaire that each juror was filling out. They were offered the opportunity to stay. And I believe that, at least it's the State's position, that defense counsel made an appropriate strategic decision to absent both himself and his client from that proceeding. As indicated in the record, counsel informed the court that he did not want Ricky Bible sitting for an hour and a half while jurors were filling out because he may not have made a good impression at that point. But the question that Bible consistently raises with respect to the one juror where the court had a dialogue, to be fair, that dialogue, a good portion of it, dealt with the medical condition that that juror had, or hearing inability, the fact that she didn't understand things, the fact that she had prior, just I think immediately prior to this particular case, had been absented from jury selection in another case because of the problems that she had. With respect to the one question that she did ask, she indicated she didn't understand what it meant in the questionnaire. It says, can you be fair? She indicated to the court that she had heard something about the case, but she didn't understand the question. The judge said, can you be fair? And she said, I think I can. And the judge said, well, then that's the answer. You can be fair. But in all honesty, the judge went on and said, I just don't think you're going to be able to serve on this jury anyway. So there's no prejudice in this case. This is the one who had the hearing problems? That's correct. And are we confident? Because the transcript at that point only identifies an unidentified prospective juror, and it doesn't identify them by letters or numbers, but we know which unidentified prospective juror is talking. So I look at that colloquy, and if that's the juror that the counsel is referring to, she's excused for hearing problems. Are we confident it's the same juror? Yes, I'm confident in reading the transcript that it is. It's one colloquy on that particular subject, along with the one question about being fair and not understanding that question. It does say potential juror in each of the answers that are given. But I believe the record bears that out. It is the same juror that we're talking about. The publicity in this case also indicates that in the beginning of this case, there was more publicity than towards the four months prior to the trial. But it wasn't of a nature that is presumed prejudice, like in Rideau where the defendant's confession was televised and played three times on the television, and all of the jurors who came for his trial had seen that. It wasn't a situation where any of pretrial publicity was televised regarding anything about Ricky Bible. In fact, the district court noted that the Arizona Supreme Court found that most of the publicity in this case was of a factual nature, except for a few circumstances, the polygraph being one of them. Now, that particular polygraph information that was coming out, for the most part, most of those articles dealt with the State's motion to try to admit that evidence. And there is no clearly established Supreme Court precedent indicating that there is presumed prejudice when the State tries to admit evidence that is later not admissible. So under the AEDPA, Bible can't show any habeas relief in this case based on that. The fact that the rapist comment in the media was months before the trial began. What I think the Court needs to focus on is a fair and impartial jury was impaneled in this case. They filled out the questionnaire. They were asked, what do you know about the media? What have you seen in the media? They were asked during oral voir dire, after there were some strikes for cause, can you be fair? Can you sit and listen and promise to listen to the evidence and base your decision solely on the evidence that you hear in court, fairly and impartially? Each one of them said they could. Of the jurors who served in this case, two indicated that they had qualified opinions, but they also indicated that they could sit and listen to the evidence fairly and impartially and decide the case solely on that evidence. There is no evidence in this record indicating that the jury was biased or not impartial or did anything other than follow the admonition of the court. With respect to pretrial publicity during the trial, there's no evidence in this record that the jury followed the pretrial or the trial publicity reports that were there, if any. What we do know is that the trial court, immediately after jury selection, admonished the jury, strongly admonished the jury, at defense counsel's behest to not look at any reports in the media, not to listen to people who talk about the case that are not on the jury, not to discuss the case while the case is going on. And they were told that immediately after jury selection, they were told that prior to opening statement and after opening statement and throughout the trial. And there's no evidence that Bible can point to to demonstrate that any of the jurors did not follow that admonition. So this is a case, clearly, where the Arizona Supreme Court followed Shepard and Rideau and Estes, which are the only three presumed prejudice cases, and applied it correctly to the facts of this case. For an actual prejudice case, what would you do? And part of the difficulty here is how do you prove actual prejudice in terms of what the jurors are thinking? How would you prove that? You would have to show that one of the – there's fair record evidence of juror bias in order to show actual prejudice. And there is none in this case because the court took steps from the very beginning in Vordaer and after Vordaer in opening statement to ensure that the jurors were fair and impartial. They all took an oath saying that they were going to be fair and impartial. Didn't the district judge or the trial court prohibit defense counsel from speaking with the jurors after the trial was over? He did. Is that a regular practice in Arizona? Is it required by Arizona law? It's not required by Arizona law, I don't believe, at the time. At the time, it was a practice. It was a consistent practice to prohibit defense counsel from speaking with the jurors? As far as I know, it was a consistent practice not to. And quite honestly, with respect to today's practice as well, judges will leave it up to the jurors whether they want to talk to counsel. That's very different if counsel is prohibited from even approaching them. And so although we understand, and it seems very regular, what the trial judge did in trying to ensure they got a neutral jury, one way the defense counsel sometimes will try to get that is to try to get to the jurors afterwards and see if they can get somebody to spill the beans as to what happened inside or tell them what they really thought or expose them as uninformed or something and then try and bring the appeal here. We don't have any of that here. My understanding is that the court did not allow counsel immediately after the verdict to talk with the jury. I'm not sure whether that order prohibited defense counsel or post-conviction counsel from contacting jurors to find out if there's any evidence or anything. All I know that there's no record that that issue, that particular aspect of that issue, has been raised in state post-conviction relief or in habeas relief. So that's the best answer I could give you as to a practice or what has occurred in this case with respect to that issue. If the court wants to or has any questions regarding ineffective decisions of counsel, I'm happy to answer them at this time. We have exhaustively briefed that issue. I think with respect to the sentencing, which was the one certified issue the district court certified, clearly Bible's counsel was effective in raising mitigation on behalf of Bible. He presented a well-thought-out, well-planned mitigation case, which served to humanize Bible to the sentencer. There's no question that counsel raised the issue of drug abuse and drug history and its effect on Bible at the time and painted a picture with 15 witnesses, which were family and friends, indicating that when Bible was not on drugs, he seemed to be a loving person who had no apparent violent history. But when he was on drugs, it was a different picture. But that was the mitigation that was presented. In his habeas petition and in state post-conviction relief, Bible, even going back further, right before sentencing, four days before sentencing, Bible's counsel asked for a neurological evaluation or testing to be done in order to bolster any organic brain damage that may be there, based on what Dr. Benheim testified to at sentencing. In that case, prior to the sentencing, there was no indication whatsoever that Bible had any organic brain damage or any mental illness, for that matter, based on the reports from Dr. Harrison. There was a Rule 11 that was earlier done by Dr. Gerstenberger and Dr. Benheim, who testified twice for Bible during this case. Later, in state post-conviction relief, Bible's counsel files an affidavit from a Dr. Richard Lanyon indicating that neurological testing may be something that you can look into. In no way at the state post-conviction relief, prior to sentencing, or even in his habeas petition, has Bible ever come forward with any evidence showing that neurological damage or organic brain injury was a significant factor for him. In fact, had counsel sought that information and had the trial court allowed that information, it would have been wholly contradictory to the mitigation case that defense counsel presented. The state court in this case clearly applied Strickland and did not do so unreasonably, because Bible can't show prejudice on that claim. Let me ask you something that Mr. Maynard talked about, and it's a particular twist that I hadn't picked up on. It had to do with representation of Mr. Bible at the outset. There was a newly created public defender office, and the public defender himself was named, I've forgotten, was appointed. And there was somebody younger in his office who principally bore the burden over the first several months. Now, I've missed the fact that that person may not have passed the bar exam, but clearly it was a brand-new attorney at most, which seems somewhat unusual for a charge of this nature, particularly in a high-profile case. And I wonder if you could comment on that. Well, I also missed it in the record where it indicates that she was not a lawyer. She was regularly appearing in court. My understanding of the record is the public defender was appointed, that I think her name was Jo Sotelo, the young lawyer. She did a bulk of the work, and what she did was prepare all of the DNA motions and prepare expert testimony with respect to those DNA motions, which vigorously attacked the DNA evidence that the state was trying to present. She was on the case for months and then withdrew, and the circumstances of her withdrawal, at some point Lee Phillips came on the case with her. Then she withdrew, and Francis Koopman from Phoenix came on the case. So at the time that Bible was charged, he had two counsel at all times, which was rare in Arizona because the requirement under the Arizona criminal rules for two counsel didn't come into play until 1996. So he had two counsel at all time. Now, there is nothing in the record indicating that Jo Sotelo did anything wrong, that she didn't prepare anything. She had her concerns. The record bears that out, where she visited with her ethics professor and eventually withdrew. But at no time was Bible prejudiced without counsel. With respect to the DNA motions she prepared, those were very effective motions. They left Mr. Phillips with a vast amount of attack material to the DNA, and he completed what was, I believe, a five-day fry hearing on the DNA, along with, I believe, a three-day hearing on the serology from the other blood sample, an old stale blood sample. So Bible suffered no prejudice from Jo Sotelo being on the case. And from the point that she withdrew, he always had two counsel. And the pretrial motion practice that all counsel provided was quite extensive, and it's listed out in the Arizona Supreme Court case and the district court's opinion in this case. They vigorously attacked every scientific piece of evidence that was available. They filed motions to dismiss the child molest count. They filed motions to exclude hearsay statements from the victim's mother. They filed a motion to exhume the body for further testing. So this case was vigorously challenged from the defense. If the Court doesn't have any further questions, I'll simply rely on our brief. Thank you. Mr. Marger. Let me address a couple of issues that counsel has addressed. First off, having tried over 50 cases in Arizona, I've never had a case where the judge didn't let me talk to the jury. And I know that's not on the record, but I'm just — and in this particular case, counsel said he didn't know whether or not the court ever lifted that record. It did not. In fact, there was a motion filed in the Rule 32, post-conviction relief, where they asked the court in post-conviction relief to lift the ban on talking to the jurors, and the court denied it. Additionally, part of the reason that the evidence is not developed in this case the way you would normally see is that when you go back and look at what the Rule 32 judge did, he denied evidentiary hearings. He doesn't even talk in the Rule 32 opinion, which is only about three or four pages long, about the pretrial publicity that went on in this case. When counsel says he's not aware of anywhere in the record that talks about there being a gauntlet, I would direct the court's attention to ER 284, which talks about the live video feeds into the hallways outside the courtroom and the video monitors that were set up. And there were people constantly standing there. Additionally, if the court would look to docket 98, which is Petitioner's reply on the merits on the petition for writ of habeas corpus to exhibit number or letter G, there's actually a photograph that the newspaper has showing how the monitors are set up outside. And the photograph shows, I don't know, 30 or 40 people standing there. The atmosphere in this community, the atmosphere in the courtroom, and the atmosphere when this jury was selected was not conducive to being fair to Richard Bible. It could be the most heinous crime that there could be. I wouldn't dispute that. He may be the most despicable person there is, and the evidence may have appeared to be overwhelming, but he's still entitled to a fair trial, and he didn't get it in this case. Counsel talked briefly about what happened to Mr. Wilson when Mr. Wilson was the judge, had him removed from the courtroom. That's on March 28th. The case has been going on since about the first week of March. And when the court looks at the record, prior to the trial even starting, the prosecution went to the court and said that they had concerns about Mr. Wilson and his conduct. Mr. Wilson had a guard sitting next to him throughout the entire proceeding. He had an FBI agent on the other side of him. At one point in the trial, on March 15th, Mr. Wilson stood up in the middle of trial and started going towards Mr. Bible, and the FBI agent escorted him out of the room. On March 27th, the prosecution actually went to the court for a second time to talk about Mr. Wilson's conduct within the courtroom. Now, this is unusual because this is the prosecution doing it, and they became so concerned that Mr. Wilson was from Yuma County, and they had the sheriff, who was a good friend of his, come up so that he could sit by him. Unfortunately, we don't know exactly what was going on with Mr. Wilson because counsel was ineffective. It wasn't making a record of all the things that were going on. For instance, we know from looking at newspaper articles that many of the people that were in that courtroom wore ribbons, pink ribbons, that were in support of Jennifer Wilson. Counsel never made a record of that. How would that have helped you today? It would help me today, Judge, because the jury is not supposed to be influenced by things that are not coming off that jury. But we have a Supreme Court case on addressing buttons on people in the courtroom now in Moose Lawton. That's right. So how does that help your client? I believe that it just contributes to show what the atmosphere was in the courtroom. You have an overwhelming support for the victim. You have a father. Grant, nobody denies that the man is going to be upset about the death of his child and the way that this occurred. But the court knew from the very beginning. But we really don't have the evidence that I'd like to have to show what his conduct was in the courtroom, except that we do know that it was outrageous. It was outrageous enough that you had to have guards sitting next to him, and when they have an FBI agent on one side and a police officer on another, and they have to bring in a sheriff from his hometown. Something was unusual. This is not what an American courtroom is supposed to be like. Is there any indication of what was happening with Mr. Wilson and the FBI agent and the police officer? Is that communicated to the jury in any fashion? I assume the arrangements. Well, they see him sitting next to somebody, but do they know he's under armed guard? I don't know that. The record's not clear. Well, we fault the counsel for not making a record, but if this is ñ he may not want to call this to the attention of the jury. I mean, what was the record to be created there? Well, I think the record to be created was that the tension in this courtroom and the threat that he was posing to counsel. The prosecutor says on the March 27th hearing with the court that Mr. Wilson has so much animosity towards Bible and towards Phillips, Bible's one attorney, the one who had the cinder block thrown through his window, that they fear for Phillips' safety and they fear for Bible's safety, and that's why they bring in the sheriff. Now, somebody had to see something. Unfortunately, the record isn't clear enough as to exactly what was going on. But this is going on in a very small courtroom, and when you couple it with all of the other things that are going on, including the ribbons, including the live feed right outside the courtroom door, granted we now have security and metal detectors in most courtrooms. We all came through it today. But it was unusual back then. And there was security that was brought in that everybody had to go through. It made the atmosphere different in this courtroom than we normally have. The whole setting was such. I mean, the lawyers feared for their own safety. The prosecutor actually went to the court and admitted that there had been threats against the defense lawyers in this case. That's not normal. And if you couple it with the small community, the heinousness of the crime, all the pretrial publicity, the things that are going on in that courtroom, Bible did not get a fair trial. And counsel said to you, when he talks about the colloquy, and I asked this court, go back and look at the colloquy. It's not where the judge says to her, you will be fair. He says, you'll be fair. And then she says, well, how would you answer this? And he says, oh, I would say, you know, you'll be fair. He tells her what to say. Do we know whether or not there's only, you know, the Patton case, Patton v. Yaunt, the Murphy case that talk about whether or not one has to do voir dire with a jury. In this case, we have 27 pages of voir dire, basically, that occurs in this case. We have a jury questionnaire, and that's it. All of those cases, if you look at Patton, it was ten days of jury selection. If you look at Murphy, I think it's two weeks. This jury just, counsel just left. And there is no strategic reason on this green earth for counsel to leave when the judge has said, if they ask me questions, I'm going to answer them. He may not have wanted his client to be there, but surely he should have been there. He had an obligation to protect his client's interest, and you can't do that by leaving when you know that the judge may be answering questions. Your Honors, whatever you think about Ricky Bible and the heinousness of this crime, this is not the kind of trial or trial setting that we expect in the United States. He was denied due process. He didn't get a fair trial, and you should overturn it. Thank you. We thank you. We thank both counsel for their very professional and capable arguments. The case just argued is submitted, and we are adjourned.
judges: Gould, Clifton, Bybee, Cjj